UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR BANKMERIDIAN, N.A., | Case No. 3:14-3006-MBS |
| Plaintiff, | |
| v. | |
| ASHLEY F. HOUSER, BRIAN R. SAMSON, DAVID R. RENAKER, BRIAN A. MURDOCH, JAMES W. DERRICK, JR., ADELAIDE C. McMASTER, GARY L. ROWE, STANLEY R. SMITH AND JOHN W. USSERY, | COMPLAINT AND JURY DEMAND |
| Defendants. | |

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for BankMeridian, N.A., Columbia, South Carolina ("FDIC-R"), for its Complaint, states as follows:

## I.     INTRODUCTION

1.     FDIC-R brings this case in its capacity as Receiver for BankMeridian, N.A. ("BMNA" or "Bank"), pursuant to authority granted by 12 U.S.C. § 1821.

2.     FDIC-R seeks to recover damages that former BMNA officers Ashley F. Houser ("Houser"), Brian R. Samson ("Samson"), David R. Renaker ("Renaker"), Brian A. Murdoch ("Murdoch") (collectively "the Officers"), and James W. Derrick, Jr. ("Derrick"), Adelaide C. McMaster ("McMaster"), Gary L. Rowe ("Rowe"), Stanley R. Smith ("Smith") and John W. Ussery ("Ussery") (collectively, the "Non-Officer Directors") (collectively, the Officers and the Non-Officer Directors are referenced herein as "Defendants"), caused the Bank to incur. The FDIC-R reserves the right to amend this Complaint to describe additional damages.

{N0886798 -}

3.      The Officers breached their fiduciary duties to BMNA and were negligent and grossly negligent by, among other things, recommending, presenting for approval, and/or approving, in violation of the BMNA Loan Policy ("Loan Policy") and prudent lending practices, at least nine loans between December 2006 and April 2009 ("Subject Loans").  The Officers are liable for the damages suffered as a result of their negligence, gross negligence, and breaches of their fiduciary duties.

4.      The Non-Officer Directors breached their fiduciary duties to BMNA and were grossly negligent by, among other things, approving Subject Loans in violation of the Loan Policy and prudent lending practices.  The Non-Officer Directors are liable for the damages suffered as a result of their gross negligence and breaches of their fiduciary duties.

5.      The FDIC-R seeks recovery of damages caused by the Officers' negligence, gross negligence, and breaches of their fiduciary duties and the Non-Officer Directors' gross negligence and breaches of their fiduciary duties in violating the Bank's policies and prudent lending practices.  In this lawsuit, the FDIC-R does not seek to collect upon outstanding loans, but rather seeks to collect damages flowing from the Defendants' negligence and/or gross negligence and breaches of their fiduciary duties.

## II.      PARTIES

6.      The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized and existing under the laws of the United States of America.  12 U.S.C. § § 1811-1835a.  The FDIC is an instrumentality of the United States of America.  Prior to its failure, BMNA was insured by the FDIC.  On July 29, 2011, the Bank was closed by the Office of the Comptroller of the Currency ("OCC"), and the FDIC was appointed as Receiver.  Under 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R has, among other powers, all rights, titles, powers, and privileges

of BMNA, and of account holders, depositors, and stockholders with respect to BMNA and its assets.

7.      Defendant Houser is a former officer and director of the Bank.  Houser was a founder of the Bank and served as its Chief Executive Officer ("CEO") from the Bank's inception in May 2006 until its closure in July 2011.  Houser was also a director and member of the Bank's Directors' Loan Committee ("DLC") for the same period of time.  Upon information and belief, Houser currently resides in Columbia, South Carolina.

8.      Defendant Samson is a former officer and director of the Bank.  Samson was also a founder of the Bank and was an Executive Vice President, and served as BMNA's Chief Credit Officer from May 2006 until June 2010.  Samson was also a director and a member of the Bank's DLC from May 2006 until the Bank's closure in July 2011.  Upon information and belief, Samson currently resides in Chapin, South Carolina.

9.      Defendant Renaker is a former officer and director of the Bank.  Renaker was also a founder of the Bank, was an Executive Vice President and Chief Banking Officer from May 2006 until the Bank's closure in July 2011, and was a director during the same period of time.  Renaker also was a member of the DLC from May 2006 until the Bank closed.  Upon information and belief, Renaker currently resides in Hilton Head, South Carolina.

10.     Defendant Murdoch is a former officer of the Bank.  Murdoch was a Vice President of BMNA and President of the Spartanburg, South Carolina, region from October 2006 until May 2010.  Upon information and belief, Murdoch currently resides in Inman, South Carolina.

11.     Defendant Derrick is a former director of the Bank.  Derrick was a director and a member of the Bank's DLC from May 2006 until May 2010.  Upon information and belief, Derrick currently resides in Columbia, South Carolina.

12.     Defendant McMaster is a former director of the Bank.  McMaster was a director and member of the DLC from May 2006 until the Bank closed.  Upon information and belief, McMaster currently resides in Columbia, South Carolina.

13.     Defendant Rowe is a former director of the Bank.  Rowe was a director from May 2006 until the Bank closed, and during that time Rowe served as the Chairman of the DLC. Upon information and belief, Rowe currently resides in Okatie, South Carolina.

14.     Defendant Smith is a former director of the Bank.  Smith was a director and a member of the DLC from May 2006 until the Bank closed.  Upon information and belief, Smith currently resides in Hilton Head, South Carolina.

15.     Defendant Ussery is a former director of the Bank.  Ussery was a director and a member of the DLC from May 2006 until May 2010.  Upon information and belief, Ussery currently resides in Hilton Head, South Carolina.

### III.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331 and 1345.

17.     This Court has personal jurisdiction over the Defendants, who reside in the state of South Carolina and who at all relevant times conducted business in the state of South Carolina.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because all or substantially all of the acts set forth herein occurred in this District and the FDIC-R's claims arose in this District.

### IV.     BANK LENDING AND LOAN UNDERWRITING

19.     Loan underwriting practices are the primary determinant of bank credit risk and bank credit availability and one of the most critical aspects of loan portfolio management.  Loan underwriting standards define a bank's desired level of creditworthiness for individual loans and provide uniform criteria for evaluating loans with similar characteristics.  It is also important in protecting bank capital, which can erode from imprudent lending practices.

20.     Underwriting practices can generally be characterized by the criteria used to qualify borrowers, loan pricing, repayment terms, sources of repayment, and collateral requirements.  Underwriting practices also encompass the management and administration of the loan portfolio, including its growth, concentrations in specific markets, out-of-area lending, written lending policies, and adherence to written underwriting policies.

21.     Commercial real estate ("CRE") loans are loans in which a bank takes a security interest in real property used for commercial purposes as an additional source of repayment for a loan related to that property.  Acquisition, development, and construction ("ADC") loans are a type of CRE loan in which the loan proceeds are used to acquire commercial real property and/or to finance the development and subsequent construction of a commercial project, such as single family residences, apartments, condominiums, or commercial office buildings.  CRE and ADC loans are more speculative than other types of loans because of, among other reasons, the lack of present cash flow source, uncertainties of development and sale, and the need for adequate secondary sources of repayment.  Prudent lending in this segment of banking requires sound

underwriting, timely evaluation and response to economic trends impacting the industry, and strict adherence to prudent lending policies and standards.  In short, concentrations of CRE/ADC loans in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices.

## V.     FACTUAL BACKGROUND

### A.     HISTORY AND DEMISE OF BMNA

22.     BMNA opened for business on May 16, 2006.  BMNA was founded by executive officers Houser, Samson, and Renaker, all of whom were previously officers of First South Bank of Spartanburg, South Carolina.  The Bank opened with its headquarters in Columbia, South Carolina, and a separate branch in Hilton Head, South Carolina.

23.     Under the leadership of its executive officers and with the support of its Board of Directors, BMNA embarked on an aggressive growth strategy focused on increasing the Bank's portfolio of ADC and CRE loans.  In furtherance of this strategy, in October 2006 the Bank hired Murdoch to open a branch in Spartanburg, South Carolina.  Murdoch's primary responsibility was to originate loans from that area of the state.

24.     Between June 2006 and June 2008, the Bank's asset size grew from $49.2 million to $265.4 million.  Notwithstanding this aggressive growth strategy, the Defendants did not follow the established underwriting guidelines set forth in the Bank's  Loan Policy and recommended, presented for approval, and/or approved loans made in violation of that policy and prudent underwriting standards.

25.     Even as the national and local real estate markets deteriorated and many banks slowed their ADC and CRE lending, BMNA did not do so.  By September 30, 2008, BMNA's ADC loans totaled 270 percent of its total capital, and its entire CRE portfolio (including ADC

loans) totaled 416 percent of the Bank's total capital, placing BMNA in the 89th percentile for such concentrations within its peer group.

26.     In carrying out this aggressive growth in ADC/CRE loans, the Defendants departed from prudent lending practices by recommending, presenting for approval, and approving loans that were poorly underwritten and violated the Loan Policy, many after the decline in the real estate market was well known.  These loans ultimately resulted in losses.

27.     Murdoch was terminated in May 2010, and Samson was replaced as Chief Credit Officer shortly thereafter.  However, these actions were taken too late to stem the losses from the lending practices of the previous four years.

28.     On July 29, 2011, the OCC closed BMNA and appointed the FDIC as receiver.

**B.     BMNA's LOAN POLICY AND LOAN APPROVAL PROCESS**

29.     BMNA's Board adopted the Loan Policy in May 2006.  The Loan Policy was revised several times, but the provisions relevant to the FDIC-R's claims herein did not materially change during the time that the Defendants recommended, presented for approval, and/or approved the Subject Loans.

30.     Under the Loan Policy, lending authority was structured in several tiers.  All of the Bank's existing loans to a borrower were aggregated for purposes of determining the approval authority for a requested loan.  Renaker had the authority to approve loans secured by real estate up to $750,000 and other secured loans up to $300,000.  Houser and Samson each had the authority to approve loans secured by real estate up to $1 million and other secured loans up to $750,000.  A combination of any two of Houser, Renaker, and Samson had authority to approve secured loans up to $2 million.  The DLC had the authority to approve all loans that exceeded $2 million up to the Bank's legal lending limit.  The full Board was required to

approve all loans above $500,000 where a director or executive officer of the Bank was the borrower, guarantor, or otherwise related to the borrower.

31.    For purposes of approval consideration, an originating loan officer prepared a Loan Approval Form ("LAF") and a Loan Review Presentation ("LRP"), which together described the terms of the loan, including the financial condition of the borrower and the guarantors, the collateral providing security, any exceptions to the Loan Policy, and business justifications that might warrant those exceptions. The LAF and LRP were then submitted for approval to the officers and directors with approval authority for the loan.

32.    Executive officers (i.e., Houser, Samson, and Renaker) received at least the LAF and LRP and, as necessary, other supporting documents from the loan file, such as documents verifying the borrowers' assets and income, for their approval of loans within their authority or recommendation.

33.    The Loan Policy established the criteria for loans, and any exceptions were to be noted by the recommenders and approved only for "good business reasons." Limits on loan-to-value ("LTV") ratios varied depending on the amount and purpose of the loan. The Loan Policy provided that LTV ratios should not exceed 80 percent for loans secured by income producing properties, 75 percent for land development loans and loans secured by stock (except for loans to buy stock on margin, which could have no more than a 50 percent LTV ratio), and 65 percent for raw land loans.

34.    For development and construction loans, the recommenders and approvers were required to consider the following non-exclusive factors: (a) the purpose of the loan and repayment sources; (b) the capacity of the borrower or income from the underlying property to service the debt; (c) the value of the mortgaged property; (d) the borrower's creditworthiness; (e)

the equity invested in the property (with a minimum of 20 percent of costs invested by the borrower); (f) secondary sources of repayment, including adequate liquidity and personal guaranties; (g) additional collateral or credit enhancements; and (h) other standards that could mitigate the risks inherent in real estate lending.

35.    For CRE loans, both the project and the borrower were required to exhibit satisfactory risk. CRE loans in excess of $250,000 required an appraisal conforming to generally accepted appraisal standards and the regulatory requirements of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), and an appraisal review checklist was to be completed on all appraisals to determine the quality of the appraisal.

36.    For yacht loans, the applicant needed to show the ability to repay the loan, and the amount of the loan could not exceed the North American Dealers Association Loan Value for the yacht.

## C.    THE DEFENDANTS' NEGLIGENT AND/OR GROSSLY NEGLIGENT ACTS AND BREACHES OF FIDUCIARY DUTIES

37.    As officers and/or directors of BMNA, the Defendants had duties to follow the Loan Policy and to exercise due care in recommending, presenting for approval, and/or approving the Subject Loans.

38.    Between December 2006 and April 2009, the Defendants breached their duties by causing the Bank to approve loans that would not have been made had the Defendants complied with BMNA's Loan Policy, followed prudent lending practices, and conducted and/or required the necessary due diligence, including basic loan review procedures.

39.    The Subject Loans cited herein are seven ADC and CRE loans, one refinancing loan secured by bank stock, and one yacht loan.  None of the Defendants voted against any of the

Subject Loans.  Defendants recommended and/or approved the Subject Loans even though the LAFs and LRPs and the supporting materials that they received reflected significant underwriting deficiencies, violations of the Loan Policy, and other red flags.  Defendants also recommended or approved the Subject Loans even though the supporting documents lacked – and Defendants failed to request – critical information and analysis regarding the borrowers, guarantors, collateral, and other repayment sources.

40.    Moreover, at least as early as November 2007, the evidence shows that Defendants were aware that the local real estate market was declining.  In a Board meeting on November 27, 2007, before six of the nine Subject Loans were originated, Defendant Houser noted that there were significant weaknesses in the real estate markets in the Bank's core lending areas.  Nevertheless, Defendants continued to recommend and approve speculative CRE loans without ensuring an adequate evaluation of the creditworthiness of borrowers and guarantors and the sufficiency of collateral.

41.    The Defendants' repeated violations of BMNA's Loan Policy and prudent lending practices occurred throughout the lending process.  The Officer Defendants who recommended, presented for approval, and/or approved the Subject Loans were negligent and grossly negligent and breached their fiduciary duties.  The Non-Officer Directors who approved the Subject Loans were grossly negligent and breached their fiduciary duties.

42.    But for the Defendants' wrongful conduct, BMNA would not have made the Subject Loans on the terms presented, as alleged below.

## VI.    THE SUBJECT LOANS

43.    The Subject Loans set forth below illustrate failures, breaches, and violations of duty by each of the Defendants, resulting in damages to the Plaintiff.  FDIC-R seeks

compensatory damages and other relief as a result of Defendants' actions and conduct as described below.

### Borrower A[1]  (Loan 1)

44.    Pursuant to the recommendation of Houser and Samson and the approval of DLC members Houser, Samson, Renaker, Rowe, and Ussery at the December 12, 2006 DLC meeting, BMNA entered into a loan to Borrower A in the amount of $7.9 million (hereafter "Loan 1 to Borrower A") on January 26, 2007.  The purpose of the loan was to re-finance the acquisition of a 140-acre tract of land outside of Columbia, South Carolina, and install the infrastructure for the first phase of a 344 lot subdivision.  The term of the loan was two years, with monthly payments of interest only required, plus quarterly curtailments of $565,000 commencing on the ninth month from the date of the note.  The borrowing entity was created in 2006 for the purpose of owning the property, and the guarantors were a father and son (hereafter "Guarantor F" and "Guarantor S") who were the principals of the borrower.  Because the loan amount exceeded BMNA's legal lending limit, the Bank retained $3 million of the loan and sold participation interests for the remaining loan amount to other financial institutions.

45.    Defendants Houser, Samson, Renaker, Rowe, and Ussery were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving Loan 1 to Borrower A as evidenced by, among other things, their violations of the Loan Policy, failure to require adequate pre-approval analysis, and failure to comply with prudent underwriting standards.  For example:

---

[1]    In light of privacy considerations, the identities of specific borrowers and guarantors in the transactions described herein are being withheld.  All pertinent information necessary for the Defendants to identify the transactions, including the borrowers and loan numbers, has been provided to counsel for the Defendants.

a.      BMNA's Loan Policy stated that land acquisition loans were considered high risk and that loans to finance speculative land purchases without a clear repayment plan other than the sale of the land were an exception to policy.  The LAF indicated that repayment would come from sale of lots to builders, making the loan a speculative, high risk undertaking and an exception to BMNA's Loan Policy.

b.      The Loan Policy also stated that land development loans should only be made to developers with (a) a successful track record in the local market, and (b) alternative sources of cash to help service the debt should sales not meet expectations.  The defendants who recommended and/or approved this loan violated the Bank's Loan Policy, as neither of the requirements for making a land development loan were met, as set forth more fully below.

c.      The developers of the project, Guarantors F and S, had no previous experience with a project of this size.  Guarantor F was a retired insurance executive with no experience developing residential subdivisions.  Guarantor S was employed in the home construction business, but the LAF did not indicate that he had experience developing a project of this magnitude and complexity.

d.      The borrower and guarantors did not have sufficient alternative sources of cash to service the debt if necessary.  Borrower A was a single purpose entity originated in August 2006 to own the property.  Thus, it had no independent means to support the loan.  Guarantor S's tax returns reflected annual gross income of $67,805 for 2004 and $146,491 for 2005, hardly sufficient to service a $7.9 million debt.  Similarly, while Guarantor F's 2004 and 2005 tax returns indicated an average annual gross income of $170,000, the LAF indicated that this was one of three large real estate parcels he had recently purchased, raising questions as to his ability to provide cash flow to service the debt.

e.      The pre-approval analysis was inadequate.  The LAF prepared for the loan had limited information on the project costs and no global cash flow analysis of the borrower and guarantors.  The rudimentary cash flow analysis for Guarantor F did not even address the loan which was being re-financed.  In fact, the lack of information on the LAF was criticized at the December 12, 2006 DLC meeting where the loan was approved, but the defendants approved it anyway.

f.      The initial funding of the loan violated the applicable LTV ratio in the Bank's Loan Policy, which called for no more than a 65% LTV ratio for loans where the collateral was vacant land.  The LAF

indicated that approximately $4 million would be funded at closing to re-finance the land acquisition costs. The appraisal for the property reflected an as is value of $3.65 million, which would have created an LTV ratio of over 100%. In order to attempt to mitigate this issue, a second mortgage position was taken on certain timber land owned by Guarantor F. However, this land only added value of $1.7 million, such that the combined LTV still exceeded 77%, thereby violating the Bank's Loan Policy.

g.   Despite the low value of the subject property, the borrower put down no cash equity at closing and the loan included an interest reserve to cover the monthly payments. The Bank's Loan Policy required the borrower to have at least 20% of equity in the land being acquired by a land acquisition loan. According to the LAF, the borrower had $201,000 in equity in the existing loan, with $257,400 committed from a home building company. Therefore, the resulting equity at closing would have been 11%, in violation of the equity requirements of the Loan Policy.

46.   Based upon the above-listed violations of the Loan Policy and prudent lending standards, the defendants identified above were negligent, grossly negligent, and breached their fiduciary duties in recommending and/or approving this loan and allowing the Bank to fund Loan 1 to Borrower A. Their acts and omissions in connection with Loan 1 to Borrower A have caused damages in an amount to be determined at trial.

**Borrower A  (Loan 2)**

47.   By December 2007, the project being financed by Loan 1 to Borrower A was experiencing delays and cost overruns. In fact, the first quarterly curtailment payment could not be made when due and was extended from November 2007 to March 2008. Further, contrary to assumptions made at the time of closing, the borrower reported that it would have to pay for installation of the project's sewer system. In connection therewith, Defendants Houser, Samson, Renaker, Derrick, Rowe, Smith, and Ussery voted to approve an additional loan to Borrower A (hereafter "Loan 2 to Borrower A") at the DLC meeting of January 15, 2008. Thereafter, on March 14, 2008, BMNA entered into Loan 2 to Borrower A in the amount of $1.2 million, with

the Bank retaining $455,000 of the loan and selling participation interests in the remaining amount.

48.    For the reasons set forth in Paragraph 45 a-g above, Loan 2 to Borrower A violated BMNA's Loan Policy and prudent underwriting standards, and/or otherwise exhibited the negligence, gross negligence and breaches of fiduciary duty of the defendants who approved this loan.  Loan 2 to Borrower A only increased the risk on a project that was behind schedule, over budget, and not meeting sales projections.  The defendants' conduct was particularly egregious in light of the declining real estate market, which was well known in January 2008.

49.    Based upon the above-listed violations of the Loan Policy and prudent lending standards, the defendants identified above were negligent, grossly negligent, and breached their fiduciary duties in recommending and approving this loan and allowing the Bank to fund Loan 2 to Borrower A.  Their acts and omissions in connection with Loan 2 to Borrower A have caused damages in an amount to be determined at trial.

50.    Neither loan to Borrower A was repaid according to its terms.  BMNA renewed the loans through July 2, 2011, by means of renewal notes, a Forbearance Agreement of October 2, 2009, and a Modification Agreement effective as of July 2, 2010.  As of the Bank's closing in July 2011, the loans had not been repaid; $126,204.85 had been charged off against Loan 1, and $363,010.81 had been charged off against Loan 2.

**Borrower B**

51.    Pursuant to the recommendation of Murdoch and the February 9, 2007 approval of Houser and Samson, BMNA entered into a loan to Borrower B in the amount of $3.35 million on February 26, 2007.  The Bank retained $2 million of the loan and sold a participation interest for the remaining loan amount.  The purpose of the loan was to re-finance the acquisition of a

50-acre tract in Troutman, North Carolina, and obtain an interest reserve for the term of the loan. The loan called for payments of interest only for 30 months, with loan proceeds being supplied as an interest reserve to cover those payments. The owners of the borrowing entity were identified as guarantors.

52.    Defendants Murdoch, Houser, and Samson were negligent and grossly negligent, and breached their fiduciary duties in recommending and/or approving the loan to Borrower B as evidenced by, among other things, their violations of the Loan Policy, failure to undertake or require adequate pre-approval analysis, and failure to comply with prudent underwriting standards. For example:

    a.    The loan violated the Bank's Loan Policy because the borrower, guarantors, and the collateral were all located in North Carolina, and therefore were not within the Bank's designated lending area of Richland County and Lexington County in the Greater Columbia, South Carolina area; and Beaufort County in the Greater Hilton Head Island, South Carolina area.

    b.    BMNA's Loan Policy stated that land acquisition loans were high risk, and loans to finance speculative land purchases without a clear repayment plan other than the sale of the land were an exception to the policy. The LAF reflected that the expected repayment source was the sale of the collateral, making the loan an exception to policy.

    c.    The defendants identified above recommended and/or approved the loan despite evidence that the borrower could not repay the loan. The LAF reflected Borrower B had income of -$21,139 as of its most recent tax return (2005), and Murdoch's LRP and Credit Memo provided no information on the borrower's financial capability. A cash flow analysis reflected Borrower B had cash flow of -$125,063 for Y/E 2004, and -$206,216 for Y/E 2005.

    d.    The defendants identified above also recommended and/or approved the loan to Borrower B despite red flags concerning the guarantors' ability to service or repay the debt. Murdoch's LRP acknowledged that one of the guarantors did not hold significant liquid assets, and the Bank's cash flow analysis reflected his cash flow for 2004 as -$49,623, and for 2005 as -$26,720. The other

guarantor's net cash flow had decreased dramatically from $1,321,388 in 2004 to $358,297 in 2005, and no explanation for the decrease was provided.

e.    The pre-approval analysis was inadequate. Murdoch accepted a rudimentary and inflated September 28, 2006 financial statement for Borrower B. For example, the stated value of the subject property was $11 million, even though the property had just been purchased by Borrower B for $3 million. Moreover, the financial statement appeared to be contradicted by Borrower B's 2005 tax return which reflected a negative net worth and land worth only $1.26 million. At a minimum, these apparent contradictions and the rudimentary nature of the borrower's financial statement called for further inquiry into Borrower B's ability to satisfy the loan, but that further inquiry did not take place.

f.    The appraisal of the subject property was deficient. First, it was addressed to Murdoch at his previous place of employment, reflecting a lack of independence between the appraiser and loan officer. Further, the appraisal did not account for the borrower's recent acquisition of the subject property for approximately $3 million. Further, the appraiser used comparables which were much smaller in size than the subject's 50 acres, without adjusting for that fact.

g.    The Bank's Loan Policy stated that it was unacceptable to add an interest reserve to land acquisition loans. Thus, the defendants cited above violated the Loan Policy in recommending and approving this loan with an interest reserve.

h.    Defendants recommended and/or approved the loan to Borrower B without requiring any cash equity from the borrower. The lack of cash equity, coupled with an interest reserve covering interest payments for the term of the loan, violated the Loan Policy and meant that there was an increased risk that the loan would not be repaid.

53.    The borrower refused to repay the loan when it became due in 2009. The Bank foreclosed on the property in early 2010, and it became Other Real Estate Owned ("OREO") on May 24, 2010. The property was still OREO when the Bank closed in July 2011.

54.    Based upon the above-listed violations of the Loan Policy and prudent lending standards, the defendants identified above were negligent, grossly negligent, and breached their

fiduciary duties in recommending and approving this loan and allowing the Bank to fund the loan to Borrower B. Their acts and omissions in connection with the loan to Borrower B have caused damages in an amount to be determined at trial.

**Borrower C**

55.    Pursuant to the recommendation (or approval) of Murdoch and approval of Houser and Samson, BMNA entered into two companion loans to Borrower C of $1.3 million and $350,000 on April 6, 2007. The purpose of the loans was to re-finance the borrower's existing $1.3 million loan secured by stock in another financial institution and provide Borrower C with additional funds. The $1.3 million note had a two-year term and required only quarterly interest payments until maturity, when the entire amount would be due. The $350,000 note was also for a two-year term and required 23 monthly payments of $4,268.77 and a balloon payment of $304,954.62. The loans to Borrower C were originated and recommended by Murdoch and approved by Houser and Samson.

56.    Defendants Murdoch, Houser, and Samson were negligent and grossly negligent and breached their fiduciary duties in recommending and/or approving the loans to Borrower C as evidenced by, among other things, their violations of Loan Policy, failure to undertake or require adequate pre-approval analysis, failure to comply with prudent underwriting standards, and failure to obtain proper approval of the loans. For example:

> a.    The loans funded on April 6, 2007; however, Murdoch did not sign the LAF until April 10, 2007 (after funding), which violated the Bank's Loan Policy. Houser and Samson have acknowledged their approval of the loan but failed to sign the LAF as required by the Bank's Loan Policy, or alternatively, failed to ensure that their signatures on an LAF were maintained in the loan file, as required by the Loan Policy. Murdoch's loan authority was only $650,000; thus, the loans to Borrower C exceeded his authority.

b.     Defendants Murdoch, Houser, and Samson recommended and/or approved the loans to Borrower C notwithstanding the fact that the loans to Borrower C violated the Bank's LTV ratio limits for loans secured by bank stock.  As set forth on the LAF, the value of the First National Bank of Spartanburg stock was $1,724,200, such that the combined loan amount of $1,650,000 created an LTV ratio of 96%, well above the 75% LTV ratio limit for such collateral as reflected on the LAF.

c.     Defendants Murdoch, Houser, and Samson recommended and/or approved the loans to Borrower C notwithstanding the fact that the borrower's financial documents belied his ability to repay the loans.  The borrower's most recent tax return (year end 2005) reflected total income of only $57,682.  Further, credit reports from January 11, 2007, and March 30, 2007, reflected extremely poor credit scores of 498 and 511, respectively.  Moreover, the borrower's financial statement was clearly unreliable.  It reflected only $100,000 of liquid assets and claimed annual income of $2,285,000, which far exceeded the income reflected on his recent tax returns.

d.     The pre-approval analysis of the loans was inadequate and misleading.  Murdoch's LRP and Credit Memorandum failed to reference the borrower's dismal credit scores and 2005 tax return.  No cash flow analysis was performed despite the borrower's "stable source of income" being identified as a strength of the loan.  Despite these and other facial deficiencies in Murdoch's presentation documents, defendants Houser and Samson nevertheless approved the loan.

57.     Due to the nature of the collateral (bank stock), the Loan Policy required the Bank and Borrower C to execute a "Regulation U" form at closing.  As set forth on the form, the maximum allowable loan to value ratio for the purchase or carrying of margin stock (as defined therein) was 50% of the stock's current value.  Because the LTV ratio on the loans was almost 100%, a violation of Regulation U (12 C.F.R. 221) and the Bank's Loan Policy occurred when the loan closed.

58.     A July 20, 2007 Loan Review Memoranda prepared by Steve Powell & Associates, the Bank's third-party loan review consultant, stated that the income shown on

Borrower C's financial statement was not consistent with the earnings reflected on his tax returns, and that his 2005 tax return did not demonstrate sufficient cash flow to cover his existing debt. It also questioned how the borrower could have such poor credit in light of the liquidity reflected on his financial statement.

59.    Various BMNA credit administration documents reflect that Borrower C was consistently delinquent in paying on the loans. Moreover, the bank stock had deteriorated in value. While the Bank was able to take some additional collateral, the borrower's default on the loans resulted in total charge downs of $901,354 on the larger loan, and $189,493 on the smaller loan, as of the Bank's closure in July 2011.

60.    Based upon the above-listed violations of the Loan Policy and prudent lending standards, the defendants identified above were negligent, grossly negligent, and breached their fiduciary duties in recommending and approving these loans and allowing the Bank to fund the loans to Borrower C. Their acts and omissions in connection with the loans to Borrower C have caused damages in an amount to be determined at trial.

**Borrower D  (Loan 1)**

61.    Pursuant to the recommendation of Renaker and the approval of DLC members Houser, Samson, Renaker, Derrick, McMaster, Rowe, Smith, and Ussery at the November 15, 2007 DLC meeting, BMNA entered into a loan to Borrower D in the amount of $870,000 on March 11, 2008 (hereafter "Loan 1 to Borrower D"). The purpose of the loan was to finance the acquisition of a 78-acre tract of land in Dorchester County, South Carolina, for use in the guarantors' construction business. The promissory note had a three-year term and called for 35 monthly payments of $7,024.74 each, and a final payment of $753,527.60. The guarantors were 3 members of a family that owned a construction business. Loan 1 to Borrower D was a

"Regulation O" loan, because one of the guarantors was a member of BMNA's Board of Directors. Defendant Renaker was the originator of Loan 1 to Borrower D, and he presented and recommended the loan to the Bank's DLC.

62.    Defendants Renaker, Houser, Samson, Derrick, McMaster, Rowe, Smith, and Ussery were negligent and grossly negligent, and breached their fiduciary duties in recommending, presenting, and/or approving Loan 1 to Borrower D, as evidenced by, among other things, their violations of the Loan Policy and failure to comply with prudent lending standards. For example:

> a.    The property being purchased and serving as the loan's collateral was located in Dorchester County, South Carolina, which was outside the Bank's designated lending area. Accordingly, Defendants' recommendation and approval of the loan was a violation of the Bank's Loan Policy.

> b.    The loan violated the Bank's LTV limit for land acquisition loans, which was 65% for vacant land. Renaker's LRP and LAF provided that the Bank would fund 90% of the acquisition costs. Further, even using the appraised value of $1 million, the Bank's loan funded 87% of the appraised value. The making of this loan also violated the Bank's policy requirement that the borrower have at least 20% equity in the project.

> c.    The Bank's Loan Policy stated that land acquisition loans were high risk and that loans to finance speculative land purchases without a clear repayment plan other than the sale of the land were an exception to policy. Because the LRP and LAF did not reflect a clear repayment plan, Defendants' recommendation and/or approval of the loan violated the Bank's Loan Policy.

> d.    The appraisal process violated the Bank's Loan Policy and prudent lending practices for real estate appraisals in several particulars. First, the appraisal was furnished to Renaker, the loan officer, notwithstanding the prudent lending practice that appraisals should not be ordered by or submitted to the lender -- in order to maintain an independent process. Further, in violation of the Bank's Loan Policy, no appraisal review was performed. Moreover, the appraisal was deficient, with only one of the comparable properties being within 18 months of the appraisal. Further, the appraiser disregarded the fact that the subject property had sold for $505,000 in December 2004 and subject to his adjustment calculation,

would have reflected a value of $550,000, far less than his $1 million estimate. Renaker did not raise these issues in his LRP or LAF and failed to ensure that proper appraisal procedures were followed.

e.    The pre-approval analysis was inadequate. The LRP recognized that Borrower D did not have the wherewithal to repay the loan, and that repayment was dependent upon cash flow from the guarantors' construction business. Further, the LRP stated that the construction of new developments and construction in general was "off considerably." Nevertheless, the LRP did not address the global cash flow needs and contingent liabilities of the construction company which was the repayment source for the loan. Moreover, while the LRP acknowledged that the loan was an exception to the Bank's Loan Policy concerning LTV ratios, Renaker incorrectly stated that the proper LTV was 75%, for improved land, whereas the appraisal reflected the collateral was vacant land, requiring a 65% LTV. Notwithstanding the foregoing, the information that was presented to the DLC was sufficient for the other members to have voted against the loan.

f.    In light of deteriorating real estate market conditions that were known to the defendants, which directly impacted the construction industry and therefore the ability of the borrower to repay this loan, defendants' recommendation and/or approval of this risky loan was an imprudent lending practice.

g.    Loan 1 to Borrower D was made with concessionary terms, including the 90% LTV ratio, as opposed to the Loan Policy's 65% LTV ratio, as well as closing fees of only 0.25%, when typically the fee would have been 1%. As such, defendants' recommendation and approval of the loan violated the Bank's Loan Policy, which required that such loans be made on the same rates and terms as for other, disinterested parties, and "Regulation O" (12 C.F.R. 215), which similarly required that loans made to insiders be made on terms available to disinterested borrowers.

63.    As set forth below, in August 2008 the Bank made an additional loan to Borrower D, in the amount of $1.5 million. The borrower did not repay the loan balance at the maturity date and the loan became in default. As of the Bank's closing in July 2011, Loan 1 to Borrower D had an unpaid balance of $686,355.

64.    Based upon the above-listed violations of the Loan Policy and prudent lending standards, the defendants identified above were negligent, grossly negligent, and breached their fiduciary duties in recommending, presenting, and approving this loan and allowing the Bank to

fund the Loan 1 to Borrower D.  Their acts and omissions in connection with Loan 1 to Borrower D have caused damages in an amount to be determined at trial.

**Borrower D  (Loan 2)**

65.    Pursuant to the recommendation of Renaker and Samson, and the approval of DLC members Houser, Samson, Renaker, Derrick, McMaster, and Rowe at the August 11, 2008 DLC meeting, BMNA entered into a loan to Borrower D in the amount of $1.5 million on August 18, 2008 (hereafter "Loan 2 to Borrower D").  The purpose of the loan was to finance the acquisition of a 22-acre tract of land in Jasper County, South Carolina, for possible further development.  The promissory note had a two-year term, with monthly interest-only payments until the full principal balance was due on August 18, 2010.  This loan had the same three guarantors as Loan 1 to Borrower D, and therefore was a "Regulation O" loan, because one of the guarantors was a member of BMNA's Board of Directors.  Defendant Renaker was the originator of Loan 2 to Borrower D.  Defendants Renaker and Samson evidenced their recommendation of the loan by signing the LAF, and Renaker presented the loan to the DLC for approval.

66.    Defendants Renaker, Samson, Houser, Derrick, McMaster, and Rowe were negligent and grossly negligent, and breached their fiduciary duties in recommending, presenting, and/or approving Loan 2 to Borrower D, as evidenced by, among other things, their violations of the Loan Policy, failure to undertake or require adequate pre-approval analysis, and failure to comply with prudent lending standards.  For example:

      a.      The Bank's Loan Policy provided that land acquisition loans were high-risk and that loans to finance speculative land purchases with a repayment plan requiring the success of the project  were an exception to policy. Because the LRP and LAF did not reflect a clear repayment plan, defendants' recommendation and/or approval of the loan was contrary to the Bank's Loan Policy.

b.    The Bank's Loan Policy stated that land development loans should only be made to developers with a successful track record in the local market. Renaker's LRP acknowledged that the principals had limited experience with residential development, making the recommendation and approval of the loan a violation of the Bank's Loan Policy.

c.    As set forth above regarding Loan 1 to Borrower D, the borrowing entity did not have the means to support or repay this loan, and repayment was entirely dependent on the financial condition of the guarantors' construction company. Despite the continuing decline of the real estate market and the guarantors' construction business since the approval of Loan 1 to Borrower D, the defendants identified above recommended and/or approved this loan. Further, the making of this loan resulted in total BMNA's total debt to these principals exceeding $5 million, a risky concentration of credit in borrowers whose wherewithal was tied to the construction industry.

d.    The recommendation and/or approval of Loan 2 to Borrower D was made notwithstanding a pro-forma income statement indicating the guarantors' construction company had a net loss of $2.6 million for the first quarter of 2008, and a predicted second quarter loss of an additional $1.9 million.

e.    The pre-approval analysis was inadequate and incomplete. The appraisal for the property securing the loan failed to discuss the known adverse market conditions, and all of the sales used as comparables were more than a year old. Notwithstanding the condition of the local real estate market, the appraiser actually increased the values of the comparables. The review of the appraisal did not point out these deficiencies and in fact, was not completed and signed until August 29, 2008, after the loan closed. This was a Loan Policy violation. Renaker did not raise these issues in his LRP or LAF and failed to ensure that proper appraisal procedures were followed.

f.    The flawed appraisal referenced above provided an "as is" value of $1.56 million for the subject property, indicating that in the absence of additional collateral the funding of the loan would violate the Bank's Loan Policy, which required a 65% LTV ratio for vacant land. While the Bank did obtain second mortgages on other property owned by the guarantors, appraisals were not obtained until after the loan funded.

g.    The Bank's Loan Policy required at least 20% borrower equity in the property acquired by a land acquisition loan. The settlement statement reflected that the entire $1.5 loan amount was funded at closing, and the borrower contributed less than $15,000. Thus, the borrower contributed virtually no equity at closing, another violation of the Bank's Loan Policy.

h.     The violations of the Loan Policy and prudent lending standards described above reflect that the loan was made on "concessionary terms" thereby violating the Bank's Loan Policy and "Regulation O" (12 C.F.R. 215), which prohibited such treatment for loans made to bank insiders. Moreover, as a "Regulation O" loan, Loan 2 to Borrower D was required by the Loan Policy to be approved by the Bank's full board of directors before the loan funded. In violation of that policy provision, the loan was not approved by BMNA's Board until after the loan was funded.

67.     As with the previous loan to Borrower D, the borrower and guarantors were unable to repay the loan when due. As of the Bank's closing in July 2011, Loan 2 to Borrower D had an unpaid balance of $1,463,972.

68.     Based upon the above-listed violations of the Loan Policy and prudent lending standards, the defendants identified above were negligent, grossly negligent, and breached their fiduciary duties in recommending, presenting, and approving this loan and allowing the Bank to fund Loan 2 to Borrower D. Their acts and omissions in connection with Loan 2 to Borrower D have caused damages in an amount to be determined at trial.

**Borrower E**

69.     Pursuant to the recommendation of Murdoch and the approval of DLC Members Houser, Samson, Renaker, Derrick, McMaster, and Ussery at the July 15, 2008 DLC meeting, BMNA entered into a loan to Borrower E in the amount of $2.76 million on July 22, 2008. The purpose of the loan was to finance the Borrower's acquisition of a retail shopping center in Greenville, South Carolina. Defendant Murdoch was the originator of the loan to Borrower E, and evidenced his recommendation of the loan by signing the LAF on July 1, 2008. Murdoch also presented the loan to the DLC for approval.

70.     Defendants Murdoch, Houser, Samson, Renaker, Derrick, McMaster, and Ussery were negligent and grossly negligent, and breached their fiduciary duties in recommending, presenting, and/or approving the loan to Borrower E as evidenced by, among other things, their

violations of the Loan Policy, failure to undertake or require adequate pre-approval analysis, and

failure to comply with prudent underwriting standards.  For example:

a.    The defendants identified above recommended and/or approved the loan despite violation of the Bank's Loan Policy regarding LTV ratios.  Despite an 80% LTV limit for loans secured by commercial income producing property, the loan amount of $2,760,000 equaled 98% of the acquisition price for the property.  The funding of the loan in this amount also violated the Loan Policy provision which required the borrower to have at least 10% equity in the cost of the land and improvements.

b.    The defendants identified above recommended and/or approved the loan despite red flags concerning the borrower's financial condition.  Murdoch's LRP clearly reflected that Borrower E was heavily invested in the local real estate market (which was known to be in severe distress by July 2008), with over $20 million in real estate loans.  Further, Borrower E's credit score of 653 reflected a weak financial condition as did the negative $584,811 Adjusted Gross Income reflected on his 2006 tax return, which was reflected on the LAF.

c.    Murdoch's LRP indicated that cash flow from lease payments from shopping center tenants would satisfy the loan payments.  However, the LRP also indicated that the shopping center had overdue repairs, required maintenance of over $200,000, and had an existing vacancy rate of 17%.  Moreover, a list of tenant lease payments reflected that more than half of the annual payments came from one primary tenant, making the success of the loan contingent upon the outcome of that relationship.

d.    The LRP and LAF indicated that a secondary source of recovery was cash flow from the borrower.  Murdoch's LRP indicated that the amount of cash on hand held by Borrower E was based on his financial statement.  Neither the Bank's executive management nor the defendant DLC members required verification of this claimed liquidity, despite the maintenance and repairs required for the building and the borrower's cash flow being listed as a repayment source.

e.    The pre-approval underwriting and analysis were inadequate.  In light of the borrower's low credit score, significant other debt, and negative adjusted gross income, an accurate cash flow analysis should have been performed.  The cash flow analysis performed on Borrower E indicated net annual cash flow of $207,199.  However, included in the cash flow was $303,140 of capital gains from sales of various stock and real estate, which therefore did not accurately portray the borrower's ability to service the debt going forward.

      f.     Prudent underwriting practices require independence in the appraisal process.  Contrary to the foregoing, the appraisal of the subject property was addressed to Murdoch, the originating lender.

      g.     In recommending and/or approving the loan, the defendants identified above violated prudent lending standards by not requiring any borrower equity.  The lack of cash equity violated the Loan Policy and increased the risk that the loan would not be repaid.

71.     As set forth in more detail below, Borrower E later became a guarantor on the loan to Borrower F.  When the loan to Borrower F defaulted in early 2009, BMNA sued Borrower E on his guaranty of that loan.  Borrower E stopped making payments on the loan to Borrower E, and the Bank filed suit against him in July 2009.

72.     As of the Bank's closure in July 2011, a total charge off of $812,756 had been taken on the loan to Borrower E.

73.     Based upon the above-listed violations of the Loan Policy and prudent lending standards, the defendants identified above were negligent, grossly negligent, and breached their fiduciary duties in recommending, presenting, and approving this loan and allowing the Bank to fund the loan to Borrower E.  Their acts and omissions in connection with the loan to Borrower E have caused damages in an amount to be determined at trial.

**Borrower F**

74.     Pursuant to the recommendation of Murdoch and the approval of DLC members Houser, Samson, Renaker, Derrick, and Ussery at the August 26, 2008 DLC meeting, BMNA entered into a loan to Borrower F in the amount of $1.4 million on August 28, 2008.  The purpose of the loan was to pay off existing Bank credit, and finance debt on a condominium unit in Orlando, Florida.  The primary collateral for the loan was a 1997 75-foot yacht.  The borrower was a newly formed single-purpose entity whose sole asset was the yacht, and the guarantors were the three principals of the borrower.  Two of the guarantors were husband and wife

(hereafter "Guarantors H&W"), and the third guarantor was Borrower E, maker of the previously-identified Subject Loan. Defendant Murdoch was the originator of the loan to Borrower F, and he evidenced his recommendation of the loan by signing the LAF on August 25, 2008. Murdoch also presented the loan to the DLC for approval.

75. Defendants Murdoch, Houser, Samson, Renaker, Derrick, and Ussery were negligent, grossly negligent, and breached their fiduciary duties in recommending, presenting, and/or approving the loan to Borrower F by, among other things, their violations of the Loan Policy, failure to undertake or require adequate pre-approval analysis, and failure to comply with prudent underwriting standards.

For example:

a.    The loan was recommended and approved by the defendants identified above despite clear signs that the loan could not be repaid. Murdoch's LRP explained that Guarantors H & W, who had owned the yacht 100% prior to the formation of Borrower F, were past due on several loans to the Bank totaling over $1 million. Further, the LRP referenced credit reports for the guarantors, which were attached to the LRP. The credit report scores for Guarantors H & W, as of July 31, 2008, were 475 for H and 570 for W, well below an acceptable level. As set forth above, Borrower E (the third guarantor) had a weak credit score of 643 and, in addition to being heavily leveraged in the real estate industry, had recently become indebted to the Bank in the amount of $2,760,000. Murdoch's LAF had given the loan a risk rating of "5," indicating "higher than normal risk"; nevertheless, the DLC members identified above approved the loan.

b.    The defendants identified above violated the Bank's Loan Policy and prudent lending practices by not requiring an appraisal on the condominium unit identified as collateral. Murdoch's LAF reflected that the $350,000 value for the condominium was derived from the purchase price, not an appraisal. Further, the condominium was located in Florida, outside of the lending area designated in the Bank's Loan Policy.

c.    The valuation survey (i.e., appraisal) which Murdoch accepted for the yacht violated the Loan Policy and prudent lending practices in several particulars. First, it was prepared for the boat's owners, and therefore violated the most basic tenet of appraisals -- that they be independent and without the potential of a conflict of interest. The Bank's Loan Policy

specifically forbade appraisals furnished by borrowers and/or addressed to borrowers.  Second, the survey was not signed, calling its authenticity and finality into question.  Third, the surveyor did not conduct a sea trial or out-of-water inspection, so the valuation was limited.

d.      Contrary to prudent lending practices, the defendants identified above recommended and approved the loan without requiring cash equity from the borrower.

e.      Murdoch's underwriting and presentation of the loan was incomplete and misleading.  The LRP and LAF reflect that he relied upon Guarantors H&W's financial statement from September 2007, without requiring updated financial information despite known adverse circumstances.  Further, the LRP failed to disclose the above-cited deficiencies in the appraisal of the boat, and Murdoch inaccurately stated that the survey found the boat to be in "good condition," when in fact those words were not used, and the boat was determined to be in average condition.  Moreover, Murdoch did not disclose that the boat was located in Florida, outside of the Bank's lending area as set forth in the Loan Policy.  Nevertheless, for the reasons set forth above, the information which was presented in the documents received by DLC members was sufficient for them to have voted against the loan.

76.     Murdoch's LRP and LAF indicated that a repayment source for the loan would be income from charter of the boat.  Notwithstanding the dire financial straits of Guarantors H&W (former sole owners of the vessel), he accepted faxed versions of two alleged charter agreements without verification and without requiring the proceeds to be paid directly to the Bank.  The first payment of principal and interest was due in January 2009 but was not paid.  Only then did Murdoch attempt to verify that the alleged charter agreements were genuine, and he determined that at least one of them was fabricated.

77.     The borrower defaulted on the loan in early 2009.  The Bank ultimately obtained the yacht through foreclosure as bank-owned collateral.  An appraisal on the condominium unit as of October 14, 2010 reflected a value of $155,000, less than half the value stated in the LAF.  The Bank received no recovery from the borrower or three guarantors.  As of the Bank's closing, a charge off of $983,697 had been taken on the loan to Borrower F.

78.     Based upon the above-listed violations of the Loan Policy and prudent lending standards, the defendants identified above were negligent, grossly negligent, and breached their fiduciary duties in recommending, presenting, and approving this loan and allowing the Bank to fund the loan to Borrower F.  Their acts and omissions in connection with the loan to Borrower F have caused damages in an amount to be determined at trial.

**Borrower G**

79.     Pursuant to the recommendation of Samson and Renaker and the approval of DLC members Houser, Samson, Renaker, Derrick, McMaster, Rowe, Smith, and Ussery at the April 21, 2009 DLC meeting, BMNA entered into a loan to Borrower G in the amount of $1.65 million on June 9, 2009.  The purpose of the loan was to re-finance the mortgage on a 22-acre tract of land in Hardeeville, South Carolina, and repay unsecured debt in excess of $1 million to a business associate of the borrower's principal.  The terms of the loan called for 17 monthly payments of $18,245.18 followed by a balloon payment of $1,489,791.30 due on December 9, 2010.  The guarantor of the loan was the 100% owner of the borrowing entity.  Defendants Samson and Renaker evidenced their recommendation of the loan by signing the LAF on April 21, 2009.

80.     Samson, Renaker, Houser, Derrick, McMaster, Rowe, Smith, and Ussery were negligent, grossly negligent, and breached their fiduciary duties in recommending and/or approving the loan to Borrower G by, among other things, their violations of the Loan Policy, failure to undertake or require adequate pre-approval analysis, and failure to comply with prudent underwriting standards.  For example:

> a.     The loan to Borrower G violated BMNA's Loan Policy in that it was a land loan made without a clear repayment plan.  By April 2009, the local and national real estate markets were in severe distress, making this loan particularly imprudent.

b.    The loan to Borrower G failed to meet Loan Policy standards for CRE loans, which required that the borrower and property exhibit satisfactory risk. The Loan Policy described "satisfactory risk" as including, among other things, a clear understanding of the repayment source, market conditions, and location; the capacity of the borrower to service the debt; the overall creditworthiness of the borrower; and secondary sources of repayment, including adequate liquidity. Financial information on the borrower reflected negative net income for the years 2006 and 2007, and positive income of approximately $100,000 for 2008. Cash flow analyses on the guarantor reflected wide swings from year to year, with a negative $148,880 reflected for 2006.

c.    The defendants who recommended and approved the loan did so notwithstanding the fact that the LAF reflected that the financial statements on the borrower and guarantor were dated July 1, 2008, at the time of loan approval in April 2009. The LRP for the loan reflected that the guarantor was involved with 24 separate real estate projects through various single business entities at the time the loan was presented for approval. In light of the state of the economy and the complex nature of the borrower and guarantor's real estate holdings, the approval of the loan without current financial information was contrary to prudent lending practices.

d.    The LRP reflected that the appraisal being utilized was actually prepared for another bank in 2008 and "assigned" to BMNA. The LRP further reflected that the comparables in the appraisal ranged from 2006 to early 2008 and that the appraiser made no adjustments for the decline in the real estate market. The loan officer provided his opinion in the LRP that commercial values had decreased since the comparables were sold, which undermined the appraisal's valuation. The defendants who recommended and approved this loan had the benefit of the LRP and should have required a more timely, accurate appraisal.

e.    The pre-approval analysis for the loan was inadequate and incomplete. The 2006 tax return for the guarantor reflected a business loss of $2,191,994 and total income of negative $8,500,110. The guarantors' 2007 tax return reflected a business loss of $870,549, and total income of negative $530,642, exclusive of the previous year's net operating loss. These numbers were not reflected on the loan's LRP or LAF, and the guarantor's financial situation was not adequately analyzed. Moreover, the cash flow analysis on the guarantor was performed 7 months prior to the loan's closing. Defendants Renaker and Samson were negligent, grossly negligent, and breached their fiduciary duties by recommending the loan to the DLC without requiring a more complete analysis in the LRP and LAF. Nevertheless, for the reasons set forth above, the

information which was presented was sufficient for the other DLC members to have voted against the loan.

81.    In November 2009, just a few months after the loan closed, the borrower's principal advised that he was having cash flow difficulties.  Further analyses of the borrower and guarantor at that time reflected that (a) the borrower had experienced a loss of $347,117 for the first six months of 2009, and (b) a "global" cash flow analysis for the same time period reflected a negative cash flow of $753,822.

82.    Commencing in November 2009, the borrower failed to make timely payments on the loan, and in May 2010 the Bank issued a default letter.  The Bank ultimately obtained the property as OREO.  As of the Bank's closing in July 2011, no recovery had been obtained on the loan, which had an unpaid balance of $1,592,119.

83.    Based upon the above-listed violations of the Loan Policy and prudent lending standards, the defendants identified above were negligent, grossly negligent, and breached their fiduciary duties in recommending and approving this loan and allowing the Bank to fund the loan to Borrower G.  Their acts and omissions in connection with the loan to Borrower G have caused damages in an amount to be determined at trial.

## VII.    CLAIMS FOR RELIEF

84.    FDIC-R pleads each of the following Counts in the alternative.

## COUNT I – GROSS NEGLIGENCE

85.    The allegations of Paragraphs 1 through 83 of this Complaint are incorporated herein by reference.

86.    As directors and/or officers of BMNA, the Defendants owed a duty of care to discharge their duties in good faith, with the care that an ordinarily prudent person in a like

position would exercise under similar circumstances. This duty of care included, but was not limited to, the following:

  a. To ensure that loans recommended, presented, and/or approved by them were underwritten and approved in accordance with the law, regulations, and loan policy applicable thereto and in accordance with prudent banking practices;

  b. To make all decisions, including those relating to the approval of loans, on the basis of a rational process availing themselves of all material and reasonably available information; and

  c. To faithfully and diligently perform their duties as officers and/or directors of the Bank.

  87. In disregard of their duties, the Defendants failed to exercise that degree of diligence, care, judgment, skill, and good faith which an ordinarily prudent person in a like position would have exercised under similar circumstances with respect to the recommendation, presentation, and/or approval of the loans identified herein.  The Defendants' failures to exercise reasonable diligence, care, judgment, skill, and good faith in the discharge of their responsibilities include, but are not limited to:

  a. Failing to exercise independent judgment in recommending, presenting, and/or approving loans;

  b. Failing to make decisions relating to the approval of loans on the basis of a rational process and failing to avail themselves of all material and reasonably available information;

  c. Permitting and/or performing wholly inadequate analysis of borrower/guarantor repayment capabilities (e.g., a lack of cash flow analyses, inaccurate computations of cash flow and debt service coverage ratios) in connection with the recommendation, presentation, and/or approval of loans;

  d. Requiring little or no borrower equity in real estate loans and relying on collateral (such as the sale of real estate) as a primary source of repayment;

  e. Recommending, presenting, or approving loans with grossly

inadequate documentation or verification of borrower income, financial condition, or repayment capability and collateral values;

f.    Recommending, presenting, or approving speculative real estate loans despite clear evidence of a deteriorating real estate market;

g.    Relying on inaccurate, inappropriate and/or incomplete real estate appraisals despite red flags showing these deficiencies;

h.    Approving under-secured loans contrary to prudent lending practices; and

i.    Approving loans in violation of the Bank's Loan Policy with insufficient or nonexistent mitigating factors to justify those violations.

88.    The acts and omissions of the Defendants were absent of that degree of care that was necessary under the circumstances thus constituting gross negligence on the part of the Defendants.  Further, many of the Subject Loans were recommended, presented, and approved after the deteriorating real estate market should have heightened the Defendants' scrutiny regarding those loans.

89.    As a direct and proximate result of the foregoing and other breaches, acts and omissions of the Defendants, the FDIC-R has suffered damages in an amount to be determined at trial.

90.    Pursuant to 12 U.S.C.A. § 1821(k), S. C. Code Ann. § 33-8-300 and S. C. Code Ann. § 33-8-420, the FDIC-R is entitled to recover from the Defendants all damages sustained as a result of their gross negligence alleged herein.

## COUNT II – NEGLIGENCE

91.    The allegations of Paragraphs 1 through 83 of this Complaint are incorporated herein by reference.

92.    As officers of BankMeridian, the Officer Defendants (i.e., Houser, Samson, Renaker, and Murdoch) owed a duty of care to discharge their duties in good faith, with the care that an ordinarily prudent person in a like position would exercise under similar circumstances. This duty of care included, but was not limited to, the duties set forth in Paragraph 86 (a)-(c) above.

93.    In disregard of their duties, the Officer Defendants failed to exercise that degree of diligence, care, judgment, skill, and good faith which an ordinarily prudent person in a like position would have exercised under similar circumstances in recommending, presenting, and/or approving the loans identified herein.  The Officer Defendants' failures to exercise reasonable diligence, care, judgment, skill, and good faith in the discharge of their responsibilities include, but are not limited to, the failures and breaches of duty set forth in Paragraph 87 (a)-(i) above.

94.    As a direct and proximate result of the foregoing acts of negligence, carelessness, recklessness, willfulness, wantonness, and other breaches, acts and omissions of the Officer Defendants, FDIC-R has suffered damages in an amount to be determined at trial.

95.    Pursuant to 12 U.S.C.A. § 1821(k), S. C. Code Ann. § 33-8-300 and S. C. Code Ann. § 33-8-420, the FDIC-R is entitled to recover from the Officer Defendants all damages sustained as a result of their negligence alleged herein.

## COUNT III – BREACH OF FIDUCIARY DUTIES

96.    The allegations of Paragraphs 1 through 83 of this Complaint are incorporated herein by reference.

97.    Pursuant to applicable federal statutes, regulations and South Carolina law, directors and officers of insured financial institutions, such as BMNA, stand in a fiduciary

relationship and are obligated to discharge the duties of their respective positions in accordance with the standards imposed by applicable laws.

98.    The Defendants owed fiduciary duties, individually and collectively, to exercise the highest degree of loyalty, care, diligence, and fair dealing in the management, conduct, and direction of the Bank in the course of their duties as directors and officers.  The Defendants' duties included, but were not limited to, those set forth in Paragraph 86 (a)-(c) of this Complaint.

99.    The Defendants, individually and collectively, breached their fiduciary duties by failing to exercise that degree of diligence, care, loyalty, judgment, and skill required of them in recommending, presenting, and/or approving the loans identified herein.

100.    The Defendants committed or permitted acts and omissions which resulted in damages, including, but not limited to, those acts and omissions listed in Paragraph 87 (a)-(i) of this Complaint.

101.    As a direct and proximate result of the breaches of fiduciary duty by the Defendants, FDIC-R has sustained damages in an amount to be determined at trial.

102.    Pursuant to provisions of applicable law, the FDIC-R is entitled to recover from the Defendants all damages sustained as a result of the breaches of fiduciary duty alleged herein.

**WHEREFORE, THE FDIC-R PRAYS for judgment against the Defendants as follows:**

1.    For compensatory, consequential, and other damages, jointly and severally, against Defendants for their negligence, gross negligence, and/or breaches of fiduciary duty that resulted in damages.

2.     For prejudgment, post judgment, and other appropriate interest pursuant to

12 U.S.C. § 1821(l) and South Carolina law against all Defendants on amounts for which they

are liable.

3.     For the FDIC-R's recoverable costs and expenses incurred in connection with this

matter.

4.     For any other relief as the Court may deem just, equitable or proper.

5.     Plaintiff demands a trial by jury on all issues.


Dated:   July 28, 2014                        Respectfully submitted,


                                              s/ Mark S. Barrow
                                              Mark S. Barrow, Federal I.D. No.:  1220
                                              John E. Tyler, Federal I.D. No.:  10622
                                              SWEENY, WINGATE & BARROW, P.A.
                                              1515 Lady Street
                                              Columbia, SC  29201
                                              Telephone:  (803) 256-2233
                                              Facsimile:   (803) 256-9177
                                              MSB@swblaw.com


                                              Robert J. Burvant
                                              (Motion for Admission *Pro Hac Vice* Pending)
                                              Benjamin E. Gonsoulin
                                              (Motion for Admission *Pro Hac Vice* Pending)
                                              **KING, KREBS & JURGENS, PLLC**
                                              201 St. Charles Avenue, Suite 4500
                                              New Orleans, Louisiana  70170
                                              Telephone:  (504) 582-3800
                                              Facsimile:   (504) 582-1233
                                              rburvant@kingkrebs.com
                                              bgonsoulin@kingkrebs.com

                                              ***Attorneys for Plaintiff***